# THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF CALIFORNIA

ALEX  LAMOTA MARTI,                    )          1:07-cv-00066 LJO GSA PC
                                       )
Plaintiff,                             )          FINDINGS AND RECOMMENDATION
                                       )          RE DEFENDANTS' MOTION FOR
             v.                        )          SUMMARY JUDGMENT
                                       )          (ECF No.  173)
                                       )
F. PADILLA, et al.,                    )
                                       )          OBJECTIONS DUE IN THIRTY DAYS
                        Defendants.    )
_____)

        Plaintiff  is a state prisoner proceeding pro se and in forma pauperis in this civil rights

action pursuant to 42 U.S.C. § 1983.  The matter was referred to a United States Magistrate

Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302.  Pending before the Court is

Defendants' motion for summary judgment.  Plaintiff has opposed the motion.[1]

## I.    Procedural History

        This action proceeds on the July 9, 2007, first amended complaint.  Plaintiff, an inmate in

the custody of the California Department of Corrections and Rehabilitation (CDCR) at Mule

Creek State Prison, brings this lawsuit against 22 individual defendants employed by the CDCR

at the California Substance Abuse Treatment Facility at Corcoran (SATF) where the events at

issue occurred.  All of the Defendants have been served with the first amended complaint, and all

---

[1]  On March 26, 2010, the Court issued and sent to Plaintiff the summary judgment notice required by <u>Rand v. Rowland</u>, 154 F.3d 952 (9th Cir. 1998), and <u>Klingele v. Eikenberry</u>, 849 F.2d 409 (9th Cir. 1988)  The order was re-served on Plaintiff on August 23, 212, in response to the Ninth Circuit's decision in <u>Woods v. Carey</u>, 684 F.3d 934 (9th Cir. 2012).

of the Defendants have filed the motion for summary judgment that is before the Court.  Plaintiff names the following individual defendants: Associate Warden and Acting Chief Deputy Warden Fulks; Chief Deputy Warden Polk; Captain Hansen; Capt. Lais; Capt. Reynoso; Capt. Santoro; Lieutenant and Acting Facility E Captain Tolson; Lt. Baires; Lt. Wadkins; Sergeant Munoz; Sgt. Smith; Correctional Officer (C/O) Boos; C/O Gardner; C/O Hulse; C/O Jordt; C/O Knight; C/O McGuirt; C/O Padilla; C/O Ramirez; C/O Williams; Supervising Correctional Counselor Smart; Correctional Counselor Arline.   Plaintiff claims that Defendants improperly placed in and kept him in Administrative Segregation (AdSeg) in retaliation for filing inmate grievances.   For clarity, the Court will analyze the incidents at issue in the order in which they occurred.  The allegations of the first amended complaint follow.

**February 8, 2005.**  Plaintiff was out to court "pertaining to a writ of habeas corpus on conditions of confinement at the California Substance Abuse Treatment Facility and State Prison."   When he returned, Defendants Padilla and Knight  threatened Plaintiff with retaliation "for having taken the CDCR to court and was cautioned to go easy on the CDCR witnesses." Defendants Padilla and McGuirt demoted Plaintiff from a pay position to a non-pay position. Plaintiff alleges that the non-pay position "was going to be deleted, effectively leaving plaintiff in line for being laid off."  Plaintiff alleges that he was demoted in retaliation for "having a court action against the CDCR."

**May 18, 2005.**  Defendant McGuirt threatened Plaintiff with retaliation for having asked a sergeant about a pending administrative appeal.  While McGuirt was escorting Plaintiff to get his stored legal materials, he told Plaintiff "that he should refrain from addressing grievances to the sergeant or suffer the consequences."

**July 15, 2005.**  Defendant Knight falsified a Rules Violation Report (RVR) in retaliation for "the grievances" and court action filed by Plaintiff.  Plaintiff alleges that Knight did so at the behest of Defendant McGuirt.

**August 14, 2005.**  Defendant Ramirez terminated Plaintiff's visit with his mother. Plaintiff alleges that Ramirez had no valid reason to do so.  Plaintiff and his mother filed grievances against Ramirez.  Plaintiff alleges that Ramirez retaliated by filing a false RVR.

**September 2, 2005.**  Defendants Williams, Wadkins, Smart, Hansen, Smith and Gardner segregated Plaintiff based on false allegations from a confidential informant.  Defendant Williams authored a false RVR in concert with the informant, and with no corroboration.  Defendant Wadkins authored the lock up order (CDC 114D) and Defendant Hansen "intimidated, threatened, ordered the segregation and also made references to plaintiff's history of numerous administrative appeals as justification for plaintiff's segregation."  Defendant Smart "made loud references to plaintiff such as 'we got the 602 king.'"

**September 15, 2005.**  Plaintiff alleges that between September 2, 2005, and September 15, 2005, Defendants Wadkins, Boos, Hulse and Tolson "further presented plaintiff with false assertions of multiple confidential sources to cause plaintiff's segregation, when in fact his segregation was caused by a single uncorroborated source."   Defendant Tolson "obscured" the fact that a single confidential source was the basis for Plaintiff's segregation.  Defendant Hansen assigned Defendant Knight as Plaintiff's investigative employee.  Hansen eventually recused himself from reviewing Plaintiff's segregation order due to Plaintiff's allegation of bias.  Nevertheless, Hansen participated in the Institution Classification Committee (ICC) that retained Plaintiff in AdSeg.

At the September 15, 2005, ICC hearing, it was decided that Plaintiff would be retained in AdSeg.  The committee consisted of Defendants Fulks, Arline and Hansen.  Defendant Smart, who presented the case to the committee, "was abusive, lied . . . and denied Plaintiff the right to address the committee."  Plaintiff alleges that the committee did not assess the reliability of the confidential information and based their decision "on the false pretext of multiple sources."

**November 22, 2005.**  While housed in Unit E1 of AdSeg, Plaintiff received a court order from the Second District Court of Appeals, "pertaining to conditions of incarceration in administrative segregation."  The next day, Plaintiff presented the order to Defendant Jordt, "to have said court order on record for further access to legal services."  Within an hour, Plaintiff was informed that he was being moved to a more restrictive housing unit within AdSeg.  Plaintiff alleges that Defendant Munoz "retaliated against Plaintiff by effecting this transfer solely as an

act of retaliation for the Court action filed by plaintiff in the Court of Appeals." Plaintiff had "presented numerous grievances against Defendant Jordt" before his transfer to AdSeg.

 **January 8, 2006.** Plaintiff alleges that he was found not guilty of the RVR that was the basis for his placement in AdSeg on September 2, 2005. Defendant Baires, acting as the Senior Hearing Officer, found Plaintiff not guilty. Defendants Baires and Hansen "held the final disposition of the RVR from 1-8-06 till 3-15-06, effectively prolonging Plaintiff's housing in administrative segregation." On February 1, 2006, Defendant Baires prepared a CDC Form 128G that recommended continued Placement in AdSeg and a future transfer to another institution. On March 31, 2006, Defendant Baires authored a CDC From 114D (lock up order), to continue Plaintiff's placement in AdSeg , "and recommending a transfer for false reasons." Defendant Arline, Plaintiff's correctional counselor, failed to schedule Plaintiff for ICC for release from segregation, and "ignored the Classification Staff Representative (CSR) action dated 3-3-06 to "return to CSR no later than 3/18/06 with status update, effectively leaving plaintiff in segregation for no valid reason."

 **April 3, 2006.** Defendant Lais reviewed the 114D, and "violated plaintiff's procedural protections purposely obstructing any possibility of uncovering the fact that no valid reason existed at this time to retain plaintiff in segregation." Specifically, Defendant Lais denied Plaintiff an investigative employee, witnesses and documentary evidence to allow Plaintiff to prepare for the ICC hearing that could release him from AdSeg.

 **April 10, 2006.** Plaintiff appeared before an ICC comprised of Defendants Santoro, Reynoso and Polk. Based on the February 1, 2006, chrono and the March 31, 2006, lock up order, the ICC ordered that Plaintiff be retained in AdSeg for 90 days and transferred to another institution.

 **May 11, 2006.** Plaintiff alleges that after he filed an administrative appeal, he was released from segregation to Facility D. The administrative appeal "uncovered that no reason existed for plaintiff's retention in segregation and transfer." Plaintiff's privileges and status were restored by ICC action. Upon arrival at Facility D, Defendants Smart and Williams ordered that Plaintiff be placed on orientation status, extending his segregation until May 26, 2006. Plaintiff

alleges that Defendants Smart and Williams had no authority to order Plaintiff on to orientation status, and acted "for the sole purpose of retaliating against plaintiff."

## II.   Summary Judgment

### A.   Exhaustion of Administrative Remedies

Defendants seek summary judgment on the ground that Plaintiff has failed to exhaust his available administrative remedies prior to filing suit, and that they are entitled to qualified immunity.

The failure to exhaust in compliance with section 1997e(a) is an affirmative defense under which Defendants have the burden of raising and proving the absence of exhaustion. Jones, 549 U.S. at 216; Wyatt v. Terhune, 315 F.3d 1108, 1119 (9th Cir. 2003).  On April 3, 2014, the United States Court of Appeals for the Ninth Circuit issued a decision overruling Wyatt with respect to the proper procedural device for raising the affirmative defense of exhaustion under § 1997e(a).  Albino v. Baca, 747 F.3d 1162, 1168–69 (9th Cir. 2014) (en banc). Following the decision in Albino, defendants may raise exhaustion deficiencies as an affirmative defense under § 1997e(a) in either (1) a motion to dismiss pursuant to Rule 12(b)(6)[2] or (2) a motion for summary judgment under Rule 56.  Id.  If the Court concludes that Plaintiff has failed to exhaust, the proper remedy is dismissal without prejudice of the portions of the complaint barred by § 1997e(e).  Jones, 549 U.S. at 223–24; Lira v. Herrera, 427 F.3d 1164, 1175–76 (9th Cir. 2005).

Summary judgment is appropriate when it is demonstrated that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); Albino, 747 F.3d at 1169 ("If there is a genuine dispute about material facts, summary judgment will not be granted.")  A party asserting that a fact cannot be disputed must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or

---

[2]  Motions to dismiss under Rule 12(b)(6) are only appropriate "[i]n the rare event a failure to exhaust is clear on the face of the complaint."  Albino, 747 F.3d at 1162.

other materials, or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).  The Court may consider other materials in the record not cited to by the parties, but is not required to do so.  Fed. R. Civ. P. 56(c)(3); <u>Carmen v. San Francisco Unified School Dist.</u>, 237 F.3d 1026, 1031 (9th Cir. 2001); <u>accord</u> <u>Simmons v. Navajo County, Ariz.</u>, 609 F.3d 1011, 1017 (9th Cir. 2010).  In judging the evidence at the summary judgment stage, the Court "must draw all reasonable inferences in the light most favorable to the nonmoving party."  <u>Comite de Jornaleros de Redondo Beach v. City of Redondo Beach</u>, 657 F.3d 936, 942 (9th Cir. 2011).  The Court must liberally construe Plaintiff's filings because he is a pro se prisoner.  <u>Thomas v. Ponder</u>, 611 F.3d 1144, 1150 (9th Cir. 2010) (quotation marks and citations omitted).

In a summary judgment motion for failure to exhaust administrative remedies, the defendants have the initial burden to prove "that there was an available administrative remedy, and that the prisoner did not exhaust that available remedy."  <u>Albino</u>, 747 F.3d at 1172. If the defendants carry that burden, "the burden shifts to the prisoner to come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him."  <u>Id.</u>  The ultimate burden of proof remains with defendants, however.  <u>Id.</u>  "If material facts are disputed, summary judgment should be denied, and the district judge rather than a jury should determine the facts."  <u>Id.</u> at 1166.

The Court takes judicial notice of the fact that the State of California provides its prisoners and parolees the right to appeal administratively "any policy, decision, action, condition, or omission by the department or its staff that the inmate or parolee can demonstrate as having a material adverse effect upon his or her health, safety, or welfare."  Cal.Code Regs. tit. 15 § 3084.1(a).  The process is initiated by submitting a CDCR Form 602.  <u>Id.</u> at § 3084.2(a).

At the time of the events giving rise to the present action, California prisoners were required to submit appeals within fifteen working days of the event being appealed, and the process was initiated by submission of the appeal to the informal level, or in some

circumstances, the first formal level.  Id. at §§ 3084.5, 3084.6(c) (2009).  Four levels of appeal were involved, including the informal level, first formal level, second formal level, and third formal level.  Id. at § 3084.5 (2009).  A final decision at the third level[3] of review satisfies the exhaustion requirement under 42 U.S.C. § 1997e(a).  Id. at § 3084.5(d); see Lira v. Herrera, 427 F.3d 1164, 1166 (9th Cir. 2005).  In order to satisfy § 1997e(a), California state prisoners are required to use this process to exhaust their claims prior to filing suit.  Woodford v. Ngo, 548 U.S. 81, 85 (2006); McKinney, 311 F.3d. at 1199-1201.

### B.   Retaliation

Allegations of retaliation against a prisoner's First Amendment rights to speech or to petition the government may support a 1983 claim.  Rizzo v. Dawson, 778 F.2d 5527, 532 (9th Cir. 1985); see also Valandingham v. Bojorquez, 866 F.2d 1135 (9th Cir. 1989); Pratt v. Rowland, 65 F.3d 802, 807 (9th Cir. 1995).  "Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal."  Rhodes v. Robinson, 408 F.3d 559, 567-68 (9th Cir. 2005); accord Watison v. Carter, 668 F.3d 1108, 1114-15 (9th Cir. 2012); Brodheim v. Cry, 584 F.3d 1262, 1269 (9th Cir. 2009).

An allegation of retaliation against a prisoner's First Amendment right to file a prison grievance is sufficient to support a claim under section 1983.  Bruce v. Ylst, 351 F.3d 1283, 1288 (9th Cir. 2003).  The Court must "'afford appropriate deference and flexibility' to prison officials in the evaluation of proffered legitimate penological reasons for conduct alleged to be retaliatory."  Pratt v. Rowland, 65 F.3d 802, 807 (9th Cir. 1995)(quoting Sandin v. Conner, 515 U.S. 472, 482 (1995)).  The burden is on Plaintiff to demonstrate "that there were  no legitimate correctional purposes motivating the actions he complains of."  Pratt, 65 F.3d at 808.

---

[3]  The third level is sometimes known as the Director's level.

### III.   Claims

#### 1. February 8, 2005, claims against Defendants McGuirt, Padilla and Knight.

Plaintiff was out to court "pertaining to a writ of habeas corpus on conditions of confinement at the California Substance Abuse Treatment Facility and State Prison." When he returned, Defendants Padilla and Knight threatened Plaintiff with retaliation "for having taken the CDCR to court and was cautioned to go easy on the CDCR witnesses." Plaintiff alleges that Defendants Padilla and McGuirt demoted Plaintiff from a pay position to a non-pay position. Plaintiff alleges that the non-pay position "was going to be deleted, effectively leaving Plaintiff in line for being laid off." Plaintiff alleges that he was demoted in retaliation for "having a court action against the CDCR." Plaintiff filed a grievance against Padilla and McGuirt for the demotion. Plaintiff alleges that, in retaliation for the court action and for the grievance, Defendants Padilla and McGuirt filed a false Rules Violation Report against Plaintiff.

First, Defendants note that Plaintiff does not have a right to a specific job or pay position. Cal. Code of Regulations, tit. 15, § 3040(k), and that title 15 also requires that inmates must perform assigned tasks diligently and conscientiously, must not pretend illness, or otherwise evade attendance or avoid performance in assigned work and program activities, or encourage others to do so. Id., § 304(a).

Defendants' evidence establishes that in February 2003, when Defendant Padilla assumed the yard crew officer position, Plaintiff was already working on the yard crew in a non-paid position. (Padilla Decl. ¶4; Deposition at 15:14-17.) Padilla's declaration establishes that at that time, a number of inmates on the yard crew, including Plaintiff, engaged in activities other than work during their required work hours. However, as long as the inmate workers finished their yard duties and the yard was clean and well-groomed, Padilla allowed them to engage in those activities. (Padilla Decl. ¶ 5.)

Padilla's declaration also establishes that in or around January, 2005, Padilla's supervisors expressed concern about the yard crew not wearing their blue uniforms and engaging in activities other than work, during work hours. As a result, Padilla informed the yard crew

inmates that starting immediately, they needed to wear their blue uniforms and could no longer engage recreational activities during work time.

At some point during his supervision of Plaintiff, Padilla decided to re-assign Plaintiff from his non-paid yard position to a paid yard position. Although Plaintiff had some prior below average evaluations, Padilla decided to elevate Plaintiff to a paid position because Plaintiff had the most seniority on the yard crew at that time, had potential, and Padilla wanted to give him a chance. (Id. ¶¶ 7,8.)

However, once Plaintiff received a paid yard position, his attitude towards fellow inmates and staff, his ability to work on a team, and the quantity of work produced, deteriorated. As a result, on February 7, 2005, while performing his duties as a D Facility work crew officer, Padilla re-assigned Plaintiff from a paid yard position back to a non-paid yard position. Padilla's decision to re-assign Plaintiff from a paid yard position to a non-paid yard position on February 7, 2005, was based on Plaintiff's unsatisfactory work performance and poor behavior. (Id. ¶¶ 8,9.)

The declaration of J. Flores, a sergeant assigned to the Inmate Assignment Office at SATF, establishes that at SATF, both the paid and non-paid yard crew positions fall under the Work Group/Privilege Group A1/A credit earning status. A correctional officer cannot arbitrarily or unilaterally change an inmate from a paid position into a non-paid position. In order to re-assign an inmate from a paid to a non-paid position, the officer must first submit a request for the change to the Inmate Assignment Office along with the proper paperwork, including a CDC 128B chrono explaining the reason for the pay reduction, and a work change application. Once the request is received, either the Inmate Assignment Correctional Sergeant or Lieutenant will review the paperwork and either approve or deny the change. (Flores Decl. ¶¶ 4-6.)

On or around February 7, 2005, Padilla submitted a CDC Form 132, Work Change Application and CDC 128B, General Chrono to the Inmate Assignment Office, for purposes of re-assigning Plaintiff from a paid yard crew position to a non-paid yard crew position. Plaintiff was subsequently re-assigned to a non-paid yard crew position. In September 2005, Padilla

completed another CDC Form 128B, documenting the reason why he re-assigned Plaintiff from a paid position to a non-paid position.  (Id. ¶¶ 11-13.)

Regarding Plaintiff's allegations of retaliation by Defendant McGuirt, Defendants submit the declaration of Defendant McGuirt.  Plaintiff alleges that McGuirt retaliated against him by having a discussion with Padilla and other officers regarding which inmate they preferred to remain on the yard after Padilla left his position.  (Deposition 36:13-25.)

On or around February 8, 2005, McGuirt was a C/O on D yard.  As a yard officer, McGuirt often observed yard crew inmates working on the yard doing maintenance, landscaping, or picking up trash.  McGuirt did not, however, have the authority to dictate the yard crew members' specific duties, evaluate their performance, or make any decision regarding their employment or pay status.  In the event McGuirt noticed yard crew inmates participating in recreational activities during their work time, he would inform the yard crew supervisor.  On numerous occasions while working as an officer on D Facility, McGuirt observed Plaintiff running on the yard during his work hours.  Each time, McGuirt would inform the yard crew supervisor at that time, Officer Padilla, that Plaintiff was not working during his assigned work time.  (McGuirt Decl. ¶¶ 4-7.)

On March 1, 2005, while performing his duties as a D Facility officer, Padilla observed Plaintiff running during his work hours.  Padilla told Plaintiff that running during his work hours was strictly prohibited.  The next day, on March 2, 2005, Padilla again observed Plaintiff running during work hours and ordered him to stop.  Plaintiff complied.  At that time, Padilla informed Plaintiff that he would receive a CDC 115 Rules Violation Report (RVR) for refusing a direct order and that if he continued to exercise during his work hours, he would be subject to progressive disciplinary action.  On March 2, 2005, Padilla issued a RVR to Plaintiff for violating prison rules by refusing a direct order. (Padilla Decl. ¶¶ 14-16, Deposition 37:12, 39:7-8.)

On March 20, 2005, Plaintiff was found guilty of violating prison rules.  However, the Senior Hearing Officer elected to reduce the RVR to a CDC 18A informational chrono in the interest of progressive discipline.  On the same date, a CDC 128A informational chrono was

generated and placed in Plaintiff's central file, based upon the facts and circumstances of the reduced RVR. (Padilla Decl. ¶¶ 17, 18.)

In his deposition, Plaintiff testified that prior to February 7, 2005, he never filed a CDC 602 inmate appeal against McGuirt, and that McGuirt's only involvement in the RVR was bringing the draft version to the program office. Plaintiff also admits that he was not in the program office when McGuirt brought the draft to the office. (Deposition 34:19-21; 39:1-6 , 17-20; 39:9-12.)

Defendants' evidence establishes that in order to re-assign an inmate from a paid to a non-paid position, the officer must first submit a request for the change to the Inmate Assignment Office along with the proper paperwork, including a CDC 128B chrono explaining the reason for the pay reduction, and a work change application. Once the request is received, either the Inmate Assignment Correctional Sergeant or Lieutenant will review the paperwork and approve or deny the change. Defendants' evidence establishes that Padilla's decision to re-assign Plaintiff from a paid yard position to a non-paid yard position on February 7, 2005, was based on Plaintiff's unsatisfactory work performance and poor behavior. Plaintiff's own testimony establishes that he never filed a CDC 602 inmate appeal against McGuirt, and that McGuirt's only involvement in the RVR was bringing the draft version to the program office. Plaintiff also admits that he was not in the program office when McGuirt brought the draft to the office. Judgment should therefore be entered in Defendants' favor on this claim.

In his opposition, Plaintiff appears to argue that the timing of the RVR indicates retaliatory intent, as Padilla was aware that Plaintiff filed a grievance regarding his demotion. Plaintiff argues that at the time of his promotion in December of 2004, he was one of the best workers with perfect attendance. Plaintiff argues that "it is false" that Padilla decided to assign Plaintiff from a non-pay position to a pay position based on seniority and potential. Plaintiff argues that "it is completely unreasonable" that "in 11 days, and with $7.77 in his pocket, Plaintiff turned into a complete madman, abusing his fellow prisoners, dysfunctional in teamwork, an so lazy that his quantity of work diminished drastically." (Opp'n. at 16.)

11

Plaintiff submits Exhibit 41 to support his contention that the work change application that Defendant Padilla submitted stated that Plaintiff's work record was acceptable.[4]   Exhibit 41 is a copy of an RVR dated July 15, 2005, charging Plaintiff with of delay a peace officer.  The specific conduct at issue was jogging on the track during a time not designated for his tier.   The RVR was dismissed and Plaintiff found not guilty.  Defendant Padilla submits the work change application as Exhibit 1 to his declaration.  While the application does indicate that the "acceptable" box was checked on the application, Exhibit 2, signed by Defendant Padilla, is a General Chrono indicating that on February 7, 2005, Plaintiff's position was changed from pay to non-pay based on negative attitudes toward inmates and staff, and that Plaintiff had received 128As for running during his normal work hours.

In his declaration, Plaintiff recounts his positive work history.   Plaintiff indicates that at the time of his demotion, he had never received any warnings of any kind.  Plaintiff states that he kept a meticulous log of his running schedule, indicating what days he ran and how far he ran. Plaintiff reiterates his belief that he was retaliated against, based on his statement that:

> Padilla and McGuirt did engage in an exchange in front of me on February 7, 2005, the day that Padilla effected the demotion. Padilla and McGuirt discussed what inmates should remain on the yard crew.  Padilla asked McGuirt who he would like to keep on the yard crew roster since Padilla was going to a different assignment on March 7, 2005.  Padilla told McGuirt that "it was his [McGuirt's] call.  Padilla mentioned my name and McGuirt stated that I should be fired.  McGuirt acted as my supervisor and true to McGuirt's wish, Padilla demoted me on the same day to a position that was going to be deleted.

(Pltf.'s Decl. ¶ 70.)

The Court has exhaustively reviewed Plaintiff's arguments and evidence in opposition.   Although Plaintiff clearly articulates his belief that he was retaliated against, he offers no evidence of retaliation[5]

---

[4] In his memorandum in opposition, Plaintiff refers to a specific number that refers to his statement of material disputed facts.  That number references a particular exhibit.  For ease of reference, the Court will refer to Plaintiff's Exhibits as evidentiary support.

[5]  Plaintiff's opposition consists of approximately 300 pages of pleadings, including an opposition, cross-motion for summary judgment, memorandum of points and authorities (parts A and B), a statement of material facts (disputed) in support of the opposition, an opposition to Defendants' statement of undisputed facts and approximately a

Defendants have come forward with evidence establishing that reassignment is made by the Inmate Assignment Correctional Sergeant or Lieutenant, and that Padilla's request to reassign Plaintiff was based on Plaintiff's poor behavior. As noted, Plaintiff's own testimony establishes that he never filed a CDC 602 inmate appeal against McGuirt, and that McGuirt's only involvement in the RVR was bringing the draft version to the program office. Plaintiff has not come forward with any evidence to the contrary. Judgment should therefore be entered in favor of Defendants McGuirt, Padilla and Knight on this claim.

**2. May 18, 2005 claims against McGuirt.**

Plaintiff alleges that on May 18, 2005, while being escorted to the receiving and release area to access his stored legal materials, McGuirt threatened Plaintiff with retaliation for having addressed Sgt. Sekula about an administrative appeal. Plaintiff further alleges that McGuirt told him that "he should refrain from addressing grievances to the sergeant or suffer the consequences."

The declaration of R. Gomez establishes that after reviewing all of Plaintiff's appeals filed at SATF concerning staff complaints, work incentive, visiting, segregation or disciplinary issues from 2005 to 2007, only appeal no. SATF-D-05-02129 addressed a similar issue. Exhibit 4 to Gomez's declaration is a copy of grievance SATF-D-05-02129. In the grievance, the issue, as stated by Plaintiff, is that

> on 5-18-05 C.O. McGuirt escorted me to R&R to retrieve legal materials from the connex. While waiting for McGirt to come back from another errand, I was placed in one of the holding cells in R&R. I asked C.O. Parr to relate to Sgt. Sekula an issue pertaining to a CDC 602. Upon McGuirt's return to R&R, he was called to Sekula's office and the sergeant, gesticulating angrily addressed McGuirt. Although I couldn't hear what Sekula was saying to McGuirt, he was looking intently towards me. On the way back towards D Facility, McGirt addressed me and said, 'The Sergeant just reamed my ass because of you! If you ever directly to the Sergeant again, you won't be coming back here for your legal materials!"

thousand pages of evidence. The Court will consider the first amended complaint, made under penalty of perjury, as a declaration in opposition to the motion.

The issue in grievance 05-02129 is McGuirt's treatment of Plaintiff for speaking directly to the Sergeant instead of speaking to McGuirt first.  There are no indications in the grievance that McGuirt made any objective threat to Plaintiff as a result of Plaintiff's engagement in any protected conduct.  There is no reference in the grievance to any protected conduct by Plaintiff.  There is a vague reference to retrieving legal materials from Receiving and Release, but there is nothing in the grievance that would put McGuirt on notice that the issue is retaliation for Plaintiff's exercise of protected conduct.

Plaintiff argues that the protected activity was his speaking to Sgt. Sekula.   A simple verbal threat by Defendant McGuirt does not constitute retaliation.  The grievance does not put McGuirt on notice that Plaintiff is filing a grievance challenging any specific conduct on McGuirt's behalf that was taken specifically in retaliation for Plaintiff's engagement in protected conduct.  This claim against Defendant McGuirt should therefore be dismissed for Plaintiff's failure to exhaust his available administrative remedies prior to filing suit.

### 3.   July 15, 2005, claims against Defendant Knight and McGuirt.

Plaintiff alleges that Defendant Knight falsified a RVR in retaliation for "the grievances" and court action filed by Plaintiff.  Plaintiff alleges that Knight did so at the behest of Defendant McGuirt.  Defendant Knight supports the motion for summary judgment with his declaration.  Defendant Knight declares that on or around July 15, 2005, he was working as a correctional officer in the control booth of Building 1 on D Facility.  While working as a control booth officer on July 15, 2005, Knight was informed via radio transmission that Plaintiff was jogging on the track during a non-approved time.  Knight contacted the D2 control booth and discovered that Plaintiff had informed staff that he was going to the library.  (Knight Decl. ¶¶ 7-9.)   In his deposition, Plaintiff testified that although he informed correctional staff that he was going to the law library, since the law librarian did not show up and he could not return to the building, he decided to jog on the track.  (Deposition 65:22-66:4.)

As a result, C/O Knight ordered Plaintiff to return to his cell.  Plaintiff refused Knight's direct order.  Due to Plaintiff's refusal, he had to be physically removed from the yard and placed back in his cell.  This caused a delay of approximately twenty minutes in the program.

As a result of Plaintiff's failure to obey Knight's direct order and actions which delayed the program, C/O Knight issued Plaintiff an RVR for delaying a peace officer.   C/O Knight was not ordered or coerced into filing the RVR against Plaintiff.  (Knight Decl. ¶¶ 9-11.)

Defendants' evidence establishes that the actions of C/O McGuirt and C/O Knight advanced legitimate correctional goals in maintaining order and discipline by requiring inmates to follow prison rules.  Defendants have therefore met their burden on summary judgment by coming forward with evidence that they did not file an RVR in retaliation for filing grievances.

In his opposition, Plaintiff argues that he did not violate prison rules, and that "the facts supporting Plaintiff's claims are so numerous and detailed that it will consume too much of the court's time to reiterate them here.  It is sufficient to say that the evidence proves that Defendant Padilla lied in his RVR."  (Opp'n. p. 18.)   Plaintiff contends that he was in the law library, and only started to run after his work shift was completed.  Plaintiff refers the Court to the Exhibits noted in his statement of disputed facts 94 through 134 and 209 through 264.  Those disputed facts do not reference the July 15, 2005, RVR.  Plaintiff's Exhibit 41, however, is a copy of the RVR at issue (RVR, log no. D-05-07-039), and indicates that Plaintiff was indeed charged with delaying a peace officer.  The Senior Hearing Officer ultimately found Plaintiff not guilty of the charged offense.  The Senior Hearing Officer found that " the SHO had many questions for the Reporting Employee, however, due to the specific charge of 'Delaying a Peace Officer,' The SHO believes that due to the numerous errors that this CDC-115 contains, 'Dismissal' is the only alternative."   In his declaration, Plaintiff states that Officer Knight did not order Plaintiff to return to his cell.  Knight was working the control booth of D1 Facility and Plaintiff was housed in D2 Facility.  Plaintiff also disputes that he was physically removed from the yard.

Plaintiff has not, however, come forward with any evidence that the RVR was issued in retaliation for filing an inmate grievance.  That the RVR was dismissed does not establish evidence that it was issued in retaliation for filing an inmate grievance.  Whether Plaintiff was physically removed from the yard is immaterial.  Defendant Knight has come forward with evidence that the RVR was issued based on his belief that Plaintiff was violating prison regulations.  Whether or not Plaintiff was authorized to run on the track, Knight had a good faith

belief that he did not, and that such conduct caused delay.  Plaintiff has not come forward with evidence that establishes that the RVR was issued in retaliation for filing an inmate grievance. Judgment should therefore be entered in favor of Defendants Knight and McGuirt on this claim.

### 4. August 14, 2005, claim against Defendant Ramirez.

C/O Ramirez's declaration establishes that on August 14, 2005, she received notification from the Visiting Sergeant that the D Visiting room had reached maximum capacity.  As a result, Ramirez was ordered to terminate Plaintiff's visit with his visitor.  Ramirez documented the termination of Plaintiff's visitor, and the reason for the termination, on CDC Form 998, Notice of Visitor Approval/Denial/Termination/Suspension.  Ramirez informed Plaintiff and his visitor that due to the visiting room reaching maximum capacity, their visit was being terminated. Ramirez gave Plaintiff a direct order to leave the visiting room and Plaintiff refused her order. Ramirez explained to Plaintiff that terminations are done in accordance with Title 15 and visiting guidelines, that seventeen other people before him had already been terminated, and that he was next in line to be terminated.  (Ramirez Dec. ¶¶ 5-8.)  In his deposition, Plaintiff acknowledged that Ramirez had terminated other visits on the same day.  (Deposition 53:7-14.)   Every time Officer Ramirez has given an inmate a direct order to leave the visiting area, and he refused to leave, to the extent that he had to be physically removed and escorted from the visiting area, Ramirez has written that inmate up for violating prison rules.  As a result of Plaintiff's behavior and refusal to obey Ramirez's direct order, she issued Plaintiff RVR log no. D-05-06-08-060 for the specific act of refusing a direct order (Ramirez Decl. ¶¶ 10, 12.)

The Court finds that Defendants have met their burden on summary judgment. Defendants have come forward with evidence that Plaintiff's visit was terminated due to overcrowding and not in retaliation for filing an inmate grievance.  The evidence establishes that Ramirez was informed by a superior about the number of visitors and was ordered to terminate Plaintiff's visit.  The evidence establishes that other inmate visits were terminated that same day.

In his opposition, Plaintiff argues that "on these claims the evidence on Plaintiff's behalf is overwhelming, numerous inmates have attended the same visiting day testify as to the falsity of the charges on the RVR, including the testimony of Plaintiff's mother." (Opp'n. p. 19.)

Plaintiff refers the Court to his disputed facts 265-298, 299-300, 301-347 and 348-419. Each statement of disputed fact references specific exhibits. As noted above, Plaintiff does not refer the Court to specific exhibits. Plaintiff simply offers 175 facts in support of his argument that "the testimony of the witnesses are so much different to what Ramirez's unsupported and uncorroborated statements propound." (Id.)

Plaintiff, a percipient witness to the event at issue, indicates the following in his declaration:

> On August 14, 2005, at approximately 10.00 hours, I entered the visiting room of CSATF-SP Facility D, to have a visit with my mother, Ana Maria Gonzalez.
>
> Defendant F. Ramirez was working the visiting room on August 14, 2005.
>
> At approximately 10.00 hours, I approached the central station from the entrance door to the visiting room. I turned my prison identification card to Defendant Ramirez and was directed by Ramirez to table number 34 where my mother was awaiting my arrival.
>
> At this same time, I requested that Defendant Ramirez allow me to double-up, which means to share a table, with inmate Estrada and his mother, if Ramirez determined that more free tables were needed for arriving visitors.
>
> I made the request to double-up with the Estradas, because both my mother and Mrs. Estrada have driven together for the visit, and they felt comfortable with both of us, their sons. On every prior visit, we had been allowed to share a table to continue our visits till the visiting room's closing time of 15.00 hours, instead of having the visits terminated.
>
> My request to double-up with the Estradas was precautionary, and allowed by the visiting rules. Defendant Ramirez controlled the allocation of tables and seats, and made all determinations pertaining to the doubling up of visits.
>
> At all times during the August 14, 2005, visit, my table and the Estradas' table had two empty chairs available for doubling up.
>
> On or about 13.00 hours, Defendant Ramirez called me to the central station, a desk that is located directly opposite to table number 34, and the farthest place from where I was seating with my mother.
>
> I immediately complied and walked to Defendant Ramirez's desk. At this time, Defendant Ramirez informed me that the maximum capacity of the room had been reached, and that she was

terminating my visit.  I again asked Ramirez to allow me to double-up with the Estradas.

Ramirez refused to allow me to double-up although the visiting room had plenty of room to do so.  Defendant Ramirez proceeded to prepare a CDC Form 887, Notice of Visitor Approval/Denial/Termination/Suspension for my mother Ana Maria Gonzalez, signed it, and dated said form August 14, 2005. As the form states, the termination was made by Defendant Ramirez.  Attached as Exhibit 47 is a true and correct copy of the CDC Form 887 signed and Dated by Defendant Ramirez in my presence on August 14, 2005.

Defendant Ramirez issued to me the following documents, the CDC Form 887 for my mother, a copy of said form for me, my mother's driver's license, and my prison i.d.

I returned to my table (34), and informed my mother, that had remain seated, that Defendant Ramirez had terminated our visit.

I cleared the table, helped my mother get up, kiss her, and accompanied her to the exit.  I also returned to my mother her driver's license, and gave her the CDC Form 887.  The exit was located a few feet from our table.  My mother left without coming in contact with Defendant Ramirez.

At no time during our visit did I observe Mrs. Gonzalez approach the desk from where Defendant Ramirez operated, and Defendant Ramirez never left her seat during the whole time that my visit lasted.

At no time did I witness Defendant Ramirez address my mother in any manner.  My mother never refused to leave the visiting room.

I am aware that Defendant Ramirez stated in her Declaration in Support of Defendants' Motion for Summary Judgment that when she informed my mother and I that our visit was being terminated, both my mother and I refused to leave the visiting room. (Defendants' Exhibit G, at ¶ 8).  This is not true.   Ramirez only informed me of the termination of the visit.  My mother complied immediately after I returned towards the exit door, and it had become possible for me to exit the visiting room as ordered.

I followed Defendant Ramirez's order to leave the visiting room immediately after I had accompanied my mother to the exit.  I had to return to the table since Defendant Ramirez gave me the CDC Form 887 (Exhibit 47), and my mother's driver license to give them to her (my mother), as is the usual protocol.  Once my mother left, I turned towards Ramirez's desk because the door to the exit to the visiting room for inmates was located to (Defendant Ramirez's) left.

I had to wait for the officers working the visiting room's processing area to finish with the 13.00 hours restroom break, one in a succession of breaks that were called every hour on the hour. Once I was told that I was permitted to exit the visiting room by

> Officer Rojas, not a defendant in this case, I exited the visiting room, and was processed out.
>
> I never became rude or loud, or caused a disturbance as Defendant Ramirez claims in her declaration.  This is completely false.
>
> I was not physically removed from the visiting room on August 14, 2005, or at any other time.  I was not escorted out of the visiting area by visiting staff or any other staff on August 14, 2005, or at any other time.

(Pltf.'s Decl. ¶¶ 151-170.)

Plaintiff's Exhibit 47 is a copy of a CDC Form 887 dated August 14, 2005, indicating that Plaintiff's visit was terminated due to overcrowding.  Although Plaintiff refers to approximately 175 statements of disputed facts and exhibits, the Court will not recite Plaintiff's specific exhibits in support of the motion.  The Court has reviewed the statements of disputed facts and exhibits, and notes that they include declarations that confirm Plaintiffs' view of the events regarding his termination.

Although Plaintiff declares that he did not offer any resistance, that does not establish that Ramirez filed a RVR in retaliation for the filing of a grievance against Ramirez by Plaintiff and his mother.  Due to delays not material to this case, the hearing on the RVR occurred on February 1, 2006. The Senior Hearing Officer, Lt. Rodriguez, found Plaintiff not guilty and dismissed the RVR.  Plaintiff refers the Court to his Exhibit 48.  In his findings, Lt. Rodriguez noted that Plaintiff "did not immediately follow Ramirez's orders.  The issue before the S.H.O. is not only if the defendant refused to comply with an order, but why he did not immediately comply with that order.  It is reasonable for this S.H.O. to believe that inmate MARTI was simply attempting to ascertain why he and his mother were not being allowed to double up with an inmate, (ESTRADA) who was also visiting with his mother at another table, as they had previously been allowed to do in the past." (Ex. 47.)

Plaintiff's evidence establishes that he was found not guilty of the RVR.  That does not, however, establish liability for retaliation.  Defendants have come forward with evidence that Ramirez filed the RVR based on her good faith belief that Plaintiff was violating prison rules.  That Plaintiff disagrees that he was refusing orders does, or that Plaintiff establishes that the

19

RVR was dismissed because the SHO found refusal to be mitigated, does not establish evidence of retaliation by Defendant Ramirez. Judgment for Defendant Ramirez should therefore be entered on this claim.

**5.   Plaintiff's claims against Defendants Wadkins, Smart, Hansen, Smith and Gardner for Placement in Administrative Segregation.**

Plaintiff alleges that Defendants Williams, Wadkins, Smart, Hansen, Smith and Gardner segregated Plaintiff based on false allegations from a confidential informant. Defendant Williams authored a false RVR in concert with the informant, and with no corroboration. Defendant Wadkins authored the lock up order (CDC 114D) and Defendant Hansen "intimidated, threatened, ordered the segregation and also made references to plaintiff's history of numerous administrative appeals as justification for plaintiff's segregation." Defendant Smart "made loud references to plaintiff such as 'we got the 602 king.'"

Regarding Plaintiff's allegation that Defendant Williams authored a "False RVR," his own testimony establishes that the only allegation as to Defendant Williams is his conduct in authoring the RVR. (Deposition 68:3.) Plaintiff admits that Williams never made any comments to him regarding accessing the courts or filing grievances. (Id. at 67:7-10.) The declaration of Defendant Williams establishes that on September 2, 2005, Williams was approached by a confidential source on a possible threat made by Plaintiff against Officer F. Ramirez. (Williams Decl. ¶ 3.)

Defendants' evidence establishes that due to the nature of information obtained and concern for Officer Ramirez's personal safety, Capt. Hansen and Lt. Wadkins ordered Plaintiff to be escorted to the Facility D Program Isolation Cell, and re-housed in AdSeg pending an investigation. (Williams Decl. ¶ 5; Wadkins Decl. ¶¶ 3-5; Hansen Decl. ¶ 4, Deposition 71:7-10.) Defendants' evidence establishes that Lt. Wadkins authorized and completed a CDC 144-D AdSeg Unit Placement Notice, ordering that Plaintiff be immediately removed from Facility D, Sensitive Needs Yard (SNY) and be re-housed in AdSeg pending an investigation into the threats against Officer Ramirez. (Wadkins Decl. ¶ 5, Ex. 1.) Lt. Wadkins testified that when he receives information that potentially jeopardizes the safety of inmates or staff members, his main

and only concern is to immediately remove the inmate from the facility and place him into AdSeg. (Wadkins Decl. ¶¶ 4, 7.)  Defendants' evidence establishes that the actions of Williams, Wadkins and Hansen advanced legitimate correctional goals of maintaining the safety and security of the institution.

Capt. Hansen testifies that although an inmate can request an Investigative Employee (IE) at the initial AdSeg placement hearing, if he declines the IE that is initially assigned to him, he may make a one-time request to have another IE assigned to him. (Hansen Decl. ¶ 7.)  Plaintiff requested an IE so Capt. Hansen assigned Officer Boos-Emma as his IE. (Hansen Dec. ¶ 9, Ex. 1.)  Plaintiff declined to accept her, and as a result, Capt. Hansen assigned Officer Knight as Plaintiff's IE. (Id.)  Capt. Hansen testifies that he assigned Officer Knight based upon Knight's particularized training to be an IE, current caseload at the time, and availability. (Id. ¶ 10.)  Capt. Hansen further testifies that the fact that an inmate has previously filed a grievance against an officer does not automatically preclude that staff member from being assigned as an IE (Id. ¶ 11.)  In exceptional circumstances, staff members must continue to perform their assigned duties, regardless of whether or not an inmate has filed a prior grievance against him/her. (Id.)

Plaintiff alleges that Capt. Hansen retaliated against him by first recusing himself from the initial AdSeg hearing, and thereafter participated in the ICC that elected to retain him in AdSeg.  Capt. Hansen concedes that during the course of the initial hearing, Plaintiff told him that he did not feel that Capt. Hansen could conduct a fair and impartial hearing. (Id. ¶ 12.)  Capt. Hansen testifies that although he had no bias against Plaintiff, because he originally ordered his Correctional Lieutenant to place Plaintiff in AdSeg, he agreed to allow someone else to hear and review Plaintiff's AdSeg placement order. (Id.)  Capt. Hansen further testifies that there is no institutional policy or department rule prohibiting an individual who chooses to recuse himself from reviewing a CDC 114-D AdSeg placement order, from thereafter participating in an ICC for the same inmate and incident. (Id. ¶ 15.)

Plaintiff then alleges that Defendant Tolson retaliated against him in his review of the CDC 114-D lock-up order.  Defendants' evidence establishes that on September 9, 2005, Acting

Facility Captain Tolson reviewed Plaintiff's lock-up order.  (Tolson Decl. ¶ 3, Ex. 1.)   Based on Tolson's review of the relevant reports and factors, Tolson elected to retain Plaintiff in AdSeg pending an investigation into the safety and security of the institution.  (Tolson Decl. ¶¶ 477; Lais Decl. ¶¶ 4,5.)  Tolson testified that his decision to retain Plaintiff in AdSeg was based solely on Plaintiff's continued threat to the safety and security of staff members and the institution. (Tolson Decl. ¶ 8.)

Plaintiff alleges that Counselor Smart retaliated against him for engaging in protected activity by making the comment, "We got the 602 king."  Defendants' evidence establishes that although Marti heard an individual state, "We got the 602 king," he did not see the face of the person making the statement.  (Deposition  75:17-19.)  Counselor Smart testifies that she was not in contact with Plaintiff in the hour or so before he was placed into the holding cage, did not escort him to the holding cage, and does not remember being present when Plaintiff was placed into AdSeg on September 2, 2005.  (Pltf.'s Dep. 76:6-10, Smart Decl. ¶ 4.)  She also testifies that she did not have regular contact with Plaintiff (Id.)

Plaintiff alleges that Officers Gardner, Boos, Smith and Hulse retaliated against him by falsifying CDC 1030 Confidential Disclosure Forms.  Defendants' evidence establishes that each of the officers' signatures on the bottom of the Form 1030 only verifies that he or she served Plaintiff with the form on a particular date.  (Gardner Decl. ¶¶ 1-10, Ex. 1.)  Officer Hulse testifies that at the time of service, he was not aware of, nor had any knowledge of, the facts or circumstances of Plaintiff's placement in AdSeg.  (Hulse Decl. ¶ 7.)   Further, each officer testifies that they played no role on the decision to either place or retain Plaintiff in AdSeg on or around September 2 or 12, 2005. (Gardner Decl. ¶ 7; Smith Decl. ¶ 10; Hulse Decl. ¶ 7; Boos Decl. ¶ 9.)   Defendants' evidence establishes that Defendants Gardner, Boos Smith and Hulse took no adverse action against Plaintiff, that their actions were not motivated by Plaintiff engaging in protected activities and that their actions advanced legitimate correctional goals.

22

Defendants correctly argue that Plaintiff cannot draw an inference out of the air. Richards v. Neilsen Freight Lines, 810 F.2d 898, 902 (9th Cir., 1985). There must be a factual basis to support Plaintiff's conclusion that Defendant's conduct was retaliatory. Defendant's evidence establishes that the various individuals involved in the process to place Plaintiff in AdSeg did not act in concert to retaliate against him because he filed inmate grievances, but in order to advance legitimate correctional goals. Defendants have met their burden on summary judgment regarding the September 2, 2005, placement in AdSeg.

In his opposition, Plaintiff argues that the statement, "We got the 602 king!" establishes retaliation. Defendants have come forward with evidence that Plaintiff was placed in AdSeg pursuant to correct procedure and protocol, and was afforded due process. That Defendant Smart uttered the statement regarding Plaintiff's filing of inmate grievances does not establish evidence that Plaintiff's placement in AdSeg was in retaliation for any specific First Amendment conduct of Plaintiff's. Plaintiff refers the Court to his statement of disputed facts 420-435. These statements of disputed fact indicate that Plaintiff did not threaten staff. Liability for retaliation does not, however, turn on whether Plaintiff was in fact guilty of threatening staff. Defendants' evidence establishes that, through a confidential source, a threat on staff became apparent. Utilizing the proper procedures, Plaintiff was placed in AdSeg pending an investigation. Defendants' evidence establishes that they acted in accord with prison policy and regulation, and in furtherance of legitimate correctional goals.

Plaintiff refers the Court to his statements of disputed facts number 436-491, 492-508, 509-567,568-738, and 797, to support his argument that "the Defendants concocted the allegations, had the number of informants, serving Plaintiff with four confidential information disclosure forms, obscuring the fact that no corroboration for the allegations existed, issued a false RVR that was eventually dismissed, and even after its dismissal retained Plaintiff in segregation hiding the fact that Defendant Ramirez had transferred out to SATF." (Opp'n. p. 20.) The Court declines to list the exhibits in support of the 298 statements of disputed fact that Plaintiff refers to in support of this claim. The Court has reviewed Plaintiff's evidentiary

support, and has found that Plaintiff has not come forward with evidence that his placement in AdSeg pending investigation was retaliatory.   Plaintiff offers no evidence that Gardner, Boos, Smith or Hulse retaliated against him by falsifying CDC 1030 Confidential Disclosure Forms. All of these Defendants have declared that they played no role on the decision to either place or retain Plaintiff in AdSeg on or around September 2 or 12, 2005.

Plaintiff argues that his statement of undisputed facts 436 through 588 "deal extensively with the undisputed facts submitted by Defendants.  It will unduly consume an enormous judicial time to repeat Plaintiff's responses here anew.  It is particularly poignant to direct the court's attention to the sections of the pdf that address Plaintiff's recognition of Defendant Smart's voice.  (PDF 459-469, 581-588).   Smart was there on 9/2/05.   Plaintiff's claim against Defendants Smart, Hansen, Arline, Fulks should be heard by a jury, as well as his claims against Defendants Williams, Wadkins, Boos, Gardner, Hulse, Tolson, Knight, further numerous retaliatory actions against Plaintiff."  (Opp'n. pp.  21, 22.)  Without listing the evidentiary support for exhibits 436 through 588, the Court has reviewed the exhibits referred to by Plaintiff and finds that Plaintiff has not met his burden on summary judgment.  Plaintiff appears to focus on the fact that he did not threaten staff and Defendant Smart's comment about Plaintiff's grievance activity.  Plaintiff does not, however, come forward with any evidence establishing that any of the Defendants took any action in retaliation for Plaintiff's exercise of his protected conduct.  Judgment should therefore be entered in favor of Defendants Williams, Wadkins, Smart, Hansen, Smith and Gardner on this claim.

**6.   September 15, 2005, claims against Defendants Wadkins, Boos, Hulse and Tolson.**

Plaintiff alleges that the actions of ICC members on September 15, 2005, in deciding to retain him in AdSeg violated his First Amendment right to be free from retaliation.  Defendants' evidence establishes that Defendants Smart, Hansen, Arline and Fulks were members of the September 15, 2005 ICC, and after hearing Plaintiff's individual case factors, decided to retain Plaintiff in AdSeg pending adjudication of the RVR.  (Smart Decl. ¶¶ 6, 10; Hansen Decl.¶ ¶ 16,

20; Arline Decl. ¶ ¶ 6, 26; Fulks Decl. ¶ 8.)  Plaintiff alleges that the committee should have considered the evidence or information relating to his guilt or innocence prior to retaining him in AdSeg.  Defendants' evidence establishes that the only determination to be made by the committee is whether the inmate needs to be retained in AdSeg because the inmate's presence in general population presents an immediate threat to the safety of the inmate or others, endangers institutional security, or jeopardizes the integrity of an investigation.  (Smart Decl. ¶¶ 7, 8; Hansen Decl. ¶¶ 17, 18; Arline Decl. ¶¶ 3, 4; Fulks Decl, ¶¶ 5, 6.)   When the reason for an inmate's initial placement in AdSeg is a disciplinary matter and likely to result in a formal report of violation of institution rules on a CDC Form 115, or a referral to the district attorney for possible criminal prosecution, the hearing will assume the alleged misconduct or criminal activities to be factual as reported in the segregation order. (Id.)   Defendants' evidence establishes that the committee members do not consider evidence or information relating to the guilt or innocence of the inmate. (Id.)  The evidence establishes that retaining Plaintiff in AdSeg was both necessary and justified.  (Smart Decl. ¶ 11; Hansen Decl. ¶ 21; Arline Decl. ¶ 7; Fulks Decl. ¶ 9.)

Defendants Smart, Hansen, Arline and Fulks all testify that their actions as ICC members on September 15, 2005, were solely aimed at preserving the safety and security of the inmates, staff and institution. (Smart Decl. ¶ 13; Hansen Decl. ¶ 22; Arline Decl. ¶ 8; Fulks Decl. ¶ 10.) Defendants have therefore met their burden on summary judgment regarding the September 15, 2005, AdSeg placement.

In his opposition, Plaintiff indicates that "This claim was addressed above and Plaintiff's claim should survive summary judgment."  (Opp'n. p. 22.)  Plaintiff refers to his argument regarding the September 2, 2005, placement in AdSeg pending investigation.  Plaintiff has not come forward with evidence establishing a triable issue of fact on his claim of retaliation. Judgment should therefore be entered in favor of Defendants Wadkins, Boos, Hulse and Tolson.

### 7.  November 22, 2005, claims against Defendants Jordt and Munoz.

Plaintiff alleges that Officer Jordt and Sergeant Munoz retaliated against him by denying him access to the AdSeg Law Library and moving him from Facility E, Building 1 (FEB1) to the

general AdSeg unit.  Defendants' evidence establishes that on or around November 23, 2005, FEB1 was a housing unit designated for AdSeg inmates participating in SATF's mental health programs.  (Jordt Decl. ¶ 3; Munoz Decl. ¶ 3.)  At times, inmates not participating in the mental health programs were housed in FEB1.  In the event additional bed space was needed, those inmates not meeting the mental health criteria were routinely transferred to the general AdSeg unit.  (Id., ¶ 4.)   On or around November 23, 2005, Plaintiff was housed in FEB1 but was not a participant in SATF's mental health programs.  (Id. ¶ 6.)  On November 23, 2005, Lt. Tucker decided to move Plaintiff from FEB1 to general AdSeg because additional bed space was needed for incoming inmates with mental health needs, and Plaintiff did not meet the criteria to remain in FEB1.  (Id. ¶ 7.)  The evidence establishes that Plaintiff's access to the law library in FEB1 and AdSeg was the same.  (Pltf.'s Dep. 85:19-21.)   Defendants' evidence establishes that Plaintiff failed to demonstrate that he suffered an adverse action, that Defendants retaliated against him because of his protected conduct or that their actions failed to advance a legitimate correctional goal.  The burden therefore shifts to Plaintiff to come forward with evidence establishing retaliation.

In his opposition, Plaintiff states that he "never claimed denial of AdSeg law library," and that  he  "disputes that FEB1 was a housing unit designated for Ad-Seg inmates participating in SATF's mental health programs.  This is not true and Defendants' own Operational Procedure 100 disproves it (PDF 795-796).   Further, Defendants Jordt and Munoz retaliated against Plaintiff for having filed grievances, and presenting Jordt with a court order.  Jordt and Munoz were almost instantaneous in their adverse retaliatory action of moving Plaintiff to ASU once he presented Jordt with the court order.  The harshness of ASU vis a vis E1 was a severe enough adverse action. (PDF 719-770; 795-796.)"  Defendants' evidence establishes that  when Plaintiff was moved to AdSeg, he had equally available law library access.  Plaintiff seems to dispute that he was properly placed in AdSeg, arguing that he was placed there in retaliation for presenting Defendant Jordt with a court order.  Defendants' evidence establishes that Plaintiff did not meet the criteria for housing in FEB1.  Plaintiff offers no evidence to the contrary.  The order referred to by Plaintiff in his statement of disputed fact no. 720 refers the Court to his Exhibit 90.

Exhibit 90 is an order from the Court of Appeal for the State of California, Second Appellate District, dated November 17, 2005.   The order vacates an order of dismissal in Plaintiff's appeal and grants Plaintiff fifteen days in which to cure the default.   Plaintiff presented the order to Defendant Jordt in order to gain law library access.   Plaintiff's disputed fact no. 736 contends that Jordt was working with Munoz "and both confirmed to Plaintiff that Plaintiff's move to ASU was not being made for any need of bed space."   Plaintiff refers to paragraph 372 of his declaration.   Plaintiff's central grievance is found in his declaration.

> Defendant Munoz and Defendant Jordt were solely responsible for my move to ASU on November 23, 2005.   Defendant Jordt was working with Munoz and both confirmed to me that E-1 had plenty of room and that my move to ASU was not being made for any need of bed space at E-1.
>
> On November 23, 2005, I submitted a complaint against Defendant Jordt and Defendant Munoz for the move from E-1 to ASU as a retaliatory action for having exercised both my right to file grievances and accessing the courts.   (Exhibit 16.)
>
> The move from E-1 to ASU-175 was retaliatory and meant as punishment.
>
> I am aware that Defendants Jordt and Munoz claim that FEB1 and general ASU are almost identical in programming and access to legal services, and that the main difference between the two housing units is that FEB1 was a unit specifically designated for housing Administrative Segregation inmates in SATF's mental health programs.   This is not true.

(Marti Decl. ¶¶ 372-375.)   Plaintiff's Exhibit 16 includes copies of Plaintiff's inmate grievance no. SATF 05-04821 and responses to the grievances.   The grievance alleged staff misconduct by Jordt and Munoz.   Specifically, Plaintiff alleges that once he received Priority Legal User (PLU) status, allowing him law library access, Jordt, with Munoz's permission, moved Plaintiff into the ASU.   Plaintiff alleges that Jordt "is a lazy individual who does not like doing his job; therefore, he moved appellant to the ASU so that he would not have to escort him to the law library due to his PLU status.   The appellant claims that the bed move is an abuse of CO Jordt's and Sgt. Munoz's authority."   The final, Director's Level, decision indicated that Plaintiff had not been subjected to misconduct on the part of named staff.

Plaintiff has not come forward with evidence establishing that Defendants Jordt and Munoz moved Plaintiff to ASU in retaliation for the exercise of First Amendment activity. Plaintiff may not overcome Defendants' evidence by merely declaring it is not true, or declaring Defendants' retaliatory intent.   That Plaintiff may or may not have been denied law library access and that Plaintiff presented Jordt with a court order does not establish liability for retaliation.   Defendants' evidence indicates that Plaintiff was moved pursuant to procedure, and that he had equally available law library access.   A generalized grievance that Defendants' conduct is based on Plaintiff's exercise of his First Amendment rights is insufficient to overcome Defendants' evidence that their actions were taken to advance legitimate correctional goals, and complied with policy and procedure.   Judgment should therefore be entered in favor of Defendant Jordt and Munoz.

### 8.  January 8, 2006, claims against Defendants Baires and Hansen.

Plaintiff alleges that the actions of ICC members on December 28, 2005, in deciding to retain him in AdSeg, violated his First Amendment rights to be free from retaliation. Defendants' evidence establishes that Counselor Arline was a member of the December 28, 2005 ICC, and participated by presenting Plaintiff's case factors, making a recommendation, recording what transpired at the committee, and generating a CDC 128G reflecting the committee's actions.   (Arline Decl. ¶ 10, Ex. 2.)   The committee noted that the RVR was still in the adjudication/audit process.   (Id. ¶ 11.)     Based on Plaintiff's individual case factors, the committee elected to retain Plaintiff in AdSeg pending completion of the RVR.   (Id. ¶ 12.)   Due to the seriousness of the charge, retaining Plaintiff in AdSeg was both necessary and justified. (Id. ¶ 14.)   Counselor Arline testifies that the ICC members' actions on December 28, 2005, were solely aimed at preserving the safety and security of inmates, staff, and the institution.   (Id. ¶ 13.) Defendants' evidence establishes that Arline acted to advance legitimate correctional goals, and not in retaliation for Plaintiff's protected conduct.

Plaintiff alleges that Defendants Baires and Hansen intentionally held the disposition of the RVR from January 8, 2006, until March 15, 2006, effectively prolonging his stay in AdSeg. Defendants' evidence establishes that on January 8, 2006, Lt. Baires acted as the Senior Hearing

Officer for RVR log number D-05-09-002.  (Baires Decl. ¶ 3; Deposition 80:1-2.)   At the hearing, it is the Senior Hearing Officer's responsibility to evaluate the evidence and make a determination whether the preponderance of the evidence submitted at the hearing substantiated the charge against the inmate.  (Baires Decl. ¶¶ 4, 5.)   Lt. Baires considered the evidence presented, and discovered that the confidential information relied on by Officer Williams lacked a secondary source to confirm the threat against Officer Ramirez.  (Id. ¶ 11.)  As a result of this deficiency, the preponderance of the evidence could not substantiate the charge against Plaintiff and the RVR was dismissed.  (Baires Decl. ¶ 12; Deposition 80:3-5.)

Lt. Baires' declaration establishes the various reasons that RVRs are dismissed.  (Id. ¶ 13.)  Lt. Baires further declares that based on his training and experience, just because an RVR is dismissed, or errors are found within the RVR, or the inmate is found not guilty of the charge against him, it does not automatically or necessarily mean that the charges were false or that there was some wrongdoing on the part of the charging officer.   (Id. ¶ 14.)  A dismissal only means that based on the preponderance of the evidence presented, the charge against the inmate could not be substantiated.  (Id. ¶ 15.)

Lt. Baires declares that although a significant amount of time passed between the date of the disciplinary hearing and the date when the RVR was finally signed off on by the Chief Disciplinary Officer, it is common for RVRs dealing with multiple and complex issues to take longer to review, and in fact, RVR log no. D-05-02-009 contained multiple and complex issues. (Baires Decl. ¶¶ 16-20; Deposition 81:19-82:16.)   Defendants' evidence also establishes that Capt. Hansen's only role in RVR log no. D-05-02-009 was to originally classify the RVR, as he was transferred to Pleasant Valley State Prison on November 1, 2005.  (Hansen Decl. ¶ 26, Ex. 3.)  The evidence establishes that Defendants did not retaliate against Plaintiff for exercising his First Amendment rights.

Plaintiff alleges that Counselor Arline intentionally failed to schedule him for an ICC for release from AdSeg.  Defendants' evidence establishes that sometime in February 2006, Counselor Arline became aware that the RVR against Plaintiff had been dismissed, and reviewed his case for further action.  (Arline Decl. ¶ 17.)  Plaintiff's particular case was extremely

complicated because he was a Level IV inmate serving a term of life without the possibility of parole, needed special needs yard placement and was a Departmental Review Board-controlled case. (Id. ¶ 19.)  Sometime in March 2006, acting as a liaison between Plaintiff, the facility, the CSR, and the committee, Counselor Arline had a discussion with Lt. Baires about Plaintiff's status.  (Baires Decl. ¶ 23.)  Lt. Baires informed Counselor Arline that Plaintiff still potentially posed a threat to the safety of the staff member involved in the allegation, and that Facility D was going to issue a new CDC 114-D to retain Plaintiff in AdSeg pending transfer to another institution.  (Id.)  As a result, Counselor Arline waited for a new 114-D lock-up order.  (Arline Decl. ¶ 22.)   Defendants' evidence therefore establishes that Counselor Arline did not act in retaliation for Plaintiff's exercise of his First Amendment rights.

Plaintiff argues that "the facts are quite different to what Defendants claim them to be." (Opp'n. 23.)  Plaintiff refers the Court to his disputed fact no. 589.  This indicates that the Classification Staff Representative (CSR) issued a chrono ordering "Plaintiff's return to CSR no later than 12/14/2005 with status update."  Plaintiff refers the Court to his Exhibit 74.  Exhibit 74 is a copy of a CDC 128-G, indicating that Plaintiff's 90 day extension in ASU was approved, expiring on December 14, 2005, and directing Plaintiff to be returned to CSR no later than December 14, 2005, with status update.  Plaintiff contends that Defendant Arline attempted to take Plaintiff to ICC, but couldn't because "he had failed to properly notice Plaintiff and the ICC was aborted."  Plaintiff refers to disputed facts nos. 601-604.  These statements of disputed fact reference Plaintiff's declaration, which indicates that

> On December 21, 2005, I was called for an ICC hearing.  Since they had failed to serve me with a 72 hours written notice, the hearing was not held.  It is customary of the CDCR to attempt to hold hearings when inmates are not prepared because they are not aware that they would be called.  The 72 hours notice serves the purpose of notifying the inmate of the upcoming hearing and allows time to prepare.  I was not notified and the ICC hearing couldn't be conducted.

(Marti Decl. ¶ 300.)  Plaintiff also references disputed fact nos. 612-616, which reference Exhibit 77, a copy of CDC Form 128G dated December 28, 2005, indicating that Plaintiff was originally placed in AdSeg on September 2, 2005, with a projected minimum early release date (MERD) of

December 25, 2005.   The Chrono further indicates that although Plaintiff's MERD was December 25, 2005, "considering the circumstance regarding pending RVR dated 9/2/05, it has been determined that "S" presence in the general population at SATF/SP would jeopardize the safety and security of the institution, staff and other inmates."   Because the RVR was still in the adjudication process, the committee decided to retain Plaintiff in ASU pending completion of the RVR.   Plaintiff's evidence establishes, at most, a delay in a new ICC hearing.   Plaintiff's own evidence indicates that the RVR was not resolved and, although Plaintiff's original ASU term had expired, there is no evidence that Plaintiff was held in ASU in retaliation for Plaintiff's exercise of First Amendment activity.   The undisputed evidence establishes that Plaintiff was held pursuant to proper procedure and protocol.   The RVR had not been adjudicated, and holding Plaintiff in ASU pending resolution of the RVR advanced legitimate correctional goals.

Plaintiff refers the Court to his disputed facts 660 – 668 to establish that "Baires ignored Plaintiff's letters and his duty for the sole purpose of keeping Plaintiff in segregation."  (Opp'n. p. 24.)   These facts refer the Court to Exhibits 81 to 84.   Exhibit 81 is a copy of a note from Plaintiff to Lt. Baires dated February 20, 2006, indicating that he had not yet received a final copy of the RVR.   Exhibit 82 is a notice, informing Plaintiff of a February 22, 2006, classification hearing.   Exhibit 83 is a second written request (dated February 26, 2006) to Lt. Baires requesting a final disposition of the RVR.   Exhibit 84 is a similar note from Plaintiff to Associate Warden Sherman requesting a copy of the final disposition of the RVR.   Plaintiff's evidence establishes, at most, that he did not receive a written disposition of the RVR.   Plaintiff has not come forward with evidence of a triable issue of disputed fact regarding his retaliation claim.   Judgment should therefore be entered in favor of Defendants Baires and Hansen.

**9.  April 3, 2006, claim against Defendant Lais.**

Plaintiff alleges that Captain Lais denied Plaintiff an IE, witnesses and documentary evidence to allow Plaintiff to prepare for the ICC hearing that could release him from AdSeg. Defendants' evidence establishes that the only conduct by Lais was the review of the lock-up order on April 3, 2006 (Lais Decl. 3, Ex. 1.)   Based upon his review of the relevant reports and factors, Lais elected to retain Plaintiff  in AdSeg pending his review by the ICC.  (Id. ¶ 7.)  Capt.

Lais testifies that his decision was based on Plaintiff's continued threat to the safety and security of staff members and the institution. (Id.)   Defendants' evidence establishes that Capt. Lais's actions advanced legitimate correctional goals and not in retaliation for the exercise of protected conduct.  Judgment should therefore be entered in favor of Defendant Lais.

### 10.  April 10, 2006, claims against Defendants Santoro, Reynoso and Polk.

Plaintiff alleges that ICC members Captain Reynoso, Captain Santoro and Chief Deputy Polk retaliated against him by retaining him in AdSeg pending completion of a Departmental Review Board (DRB) report.  Defendants' evidence establishes that the committee considered all relevant factors and elected to retain Plaintiff in AdSeg pending completion of the DRB report. (Reynoso Decl. ¶ 6-12; Santoro Decl. ¶ 6-12; Polk Decl. ¶ 6-12.)   All members of the committee further testify that their decision to retain Plaintiff in AdSeg and transfer him to another institution was based upon the DRB report needing to be completed before transfer could take effect, and the continued concerns for officer safety, based upon allegations that could not be substantiated.  (Id.)  Each of the committee members testify that their actions were solely aimed at preserving the safety and security of staff members and the institution.   (Id. ¶ 13.) Defendants' evidence establishes that their actions were solely aimed at preserving the safety and security of staff members and the institution, and not in retaliation for Plaintiff's exercise of conduct protected by the First Amendment.  Judgment should therefore be entered in favor of Defendants Santoro, Reynoso and Polk.

### 11.  May 11, 2006 claim against Defendants Williams and Smart.

Plaintiff 's final allegation against Officer Williams and Counselor Smart is that they retaliated against him by placing him on "orientation status" upon his return to D Facility. Defendants' evidence establishes that in May 2006, it was mandatory protocol for all AdSeg inmates returning to the yard to be placed on orientation status for an initial classification review. (Williams Decl. ¶ 15;  Smart Decl. ¶ 12.)   The evidence also establishes that the purpose of an inmate being placed on orientation status was to give the yard sufficient time to evaluate the inmate's classification and any enemy concerns, in order to determine safe and appropriate housing for the inmate on that particular yard.  (Williams Decl.  ¶12; Smart Decl. ¶ 17.)  Further,

the evidence establishes that neither Officer Williams nor Counselor Smart had the authority to either order or place any inmate on orientation status.  (Smart Decl. ¶ 16.)  Defendants' evidence establishes that neither Officer Williams nor Counselor Smart could have retaliated against Plaintiff for exercising his First Amendment rights by placing him on orientation status.

Plaintiff argues that "it is clear that Defendants were going to keep Plaintiff in ASU and transfer him out had it not been for Plaintiff's appeal uncovering that Ramirez was no longer at CSATF."  (Opp'n. p. 26.)  Plaintiff offers disputed facts nos. 705-713, which refer the Court to Exhibit 89.  Exhibit 89 is a copy of a CDC Form 128G, dated May 11, 2006, indicating that the ICC decided to "rescind ICC action of 4-10-06 in regards to the DRB referral for transfer noting that retention at SATF is now appropriate."  Plaintiff was released to Facility D.  The committee elected to retain Plaintiff on double cell status on the sensitive needs yard.

Plaintiff also refers the Court to disputed facts 698-718, 771-779 and 780-785 to "counter the facts submitted by Defendants in detail."  The Court has reviewed those facts and the exhibits in support.  Plaintiff has not come forward with evidence that creates a triable issue of fact as to whether the decision to retain him in AdSeg pending RVR review or placing him on orientation status was taken in retaliation for the exercise of his First Amendment rights.   Judgment should therefore be entered in favor of Defendants Smart and Williams.

## IV.   Conclusion

Defendants have come forward with evidence that establishes, without dispute, that their actions were taken pursuant to prison policy and procedure, and not in retaliation for Plaintiff's exercise of his First Amendment rights.  Plaintiff's subjective belief that Defendants retaliated against him is not supported by evidence.  Plaintiff has not come forward with evidence that establishes a triable issue of fact as to whether any of the actions taken by Defendants were in retaliation for the exercise of Plaintiff's First Amendment rights.   Defendants' motion for summary judgment should therefore be granted.   The Court considered the evidence  offered in support  of Plaintiff's cross-motion for summary judgment in determining whether Plaintiff could establish a triable issue of fact regarding his claims.  Plaintiff's evidence in support of his

cross-motion does not establish any evidence that Defendants retaliated against Plaintiff for his exercise of protected First Amendment activity.

Accordingly, IT IS HEREBY RECOMMENDED that:

1.    Summary should be granted on Plaintiff's claim of a threat of retaliation during the May 18, 2005, escort, on the ground that Plaintiff failed to exhaust his available administrative remedies prior to filing suit.

2.    Summary judgment be granted in favor of Defendants and against Plaintiff on his remaining claims of retaliation in violation of the First Amendment.

3.    Plaintiff's cross-motion for summary judgment be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. §636(b)(1)(B).  Within thirty days after being served with these findings and recommendations, the parties may file written objections with the Court.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections is due within ten days of the filing of objections.  The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal.  <u>Wilkerson v. Wheeler</u>, 772 F.2d 834 (9th Cir. 2014)(citing <u>Baxter v. Sullivan</u>, 923 F.2d 1398 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:    **September 25, 2015**                    **/s/ Gary S. Austin**
                                        UNITED STATES MAGISTRATE JUDGE